**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Criminal Action No. 23-cr-00070-NYW

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    MANUEL PACHECO, and
2.    EZEQUIEL PITA-CHAVOLLA,

      Defendants.

---

**ORDER ON MOTIONS TO SUPPRESS**

---

This matter is before the Court on the following:

(1)    the Motion to Suppress [Doc. 36] filed by Defendant Manuel Pacheco ("Mr. Pacheco");

(2)    the Motion to Suppress Unlawfully Obtained Evidence, and Request for an Evidentiary Hearing [Doc. 38] filed by Defendant Ezequiel Pita-Chavolla ("Mr. Pita-Chavolla" and, with Mr. Pacheco, "Defendants"); and

(3)    the Motion to Suppress Statements of Ezequiel Pita-Chavolla, and Request for Evidentiary Hearing [Doc. 39] filed by Mr. Pita-Chavolla.

Defendants largely adopt each other's suppression arguments.  *See* [Hearing Tr. at 184:7–16[1]].  The Government opposes Defendants' Motions to Suppress.  [Doc. 47; Doc.

---

[1] The Court cites to a preliminary nonpublic version of the transcript of the January 25, 2024, evidentiary hearing in this matter.  Accordingly, there may be some variations with respect to page numbers, line numbers, and precise language, should an official transcript be ordered and prepared.

48].   The Court held an evidentiary hearing on January 25, 2024, at which it received officer and expert testimony and heard legal argument on these Motions.  [Doc. 61].  For the reasons that follow, the Motion to Suppress [Doc. 36] and Motion to Suppress Unlawfully Obtained Evidence, and Request for an Evidentiary Hearing [Doc. 38] are **GRANTED**, and the Motion to Suppress Statements of Ezequiel Pita-Chavolla, and Request for Evidentiary Hearing [Doc. 39] is **DENIED**.

### BACKGROUND

The following overview is based on testimony and exhibits from the evidentiary hearing, with a particular focus on the matters relevant to those issues the Court decides. In January 2023, Colorado State Trooper Joshua St. Onge ("Trooper St. Onge") was assigned to the Smuggling Trafficking & Interdiction Section of the Colorado State Patrol as a Narcotics Criminal Interdiction Trooper.  [Hearing Tr. at 28:24–29:2; Ex. 4 at 4–5]. On January 28, 2023, Trooper St. Onge was stationed in his patrol vehicle along Interstate 25 in southern Colorado, facing northbound traffic from Mile Marker 63.  [Hearing Tr. at 4:6–17].  Just after 9:00 A.M., Trooper St. Onge "observed a lifted Dodge Ram pickup truck pass [his] location."  [*Id.* at 4:19–21]; *see also* [Ex. 4 at 5].  The vehicle had tinted windows and a new Arizona registration.  [Hearing Tr. at 4:24–5:1].

Trooper St. Onge entered the flow of traffic, caught up with the vehicle, and ran its license plate; his search revealed that the vehicle's insurance status was "unconfirmed" and may have expired in July 2022.  [*Id.* at 5:6–12, 39:10–20].  From an Automated License Plate Reader ("ALPR") database search, Trooper St. Onge also learned that the vehicle had been spotted (1) near Holbrook, Arizona, around 12:30 A.M.[2] on January 28,

---

[2] Trooper St. Onge testified that the vehicle was in Holbrook "approximately 12–13 hours prior to the traffic stop."  [Hearing Tr. at 13:24–25].  However, his police report specified

the day of the stop; (2) in Las Vegas, Nevada, on January 25; and (3) in Phoenix, Arizona, on January 24.  [*Id.* at 13:19–25; Ex. 4 at 6].  As he performed these checks, Trooper St. Onge noticed that the vehicle "appeared . . . to be pulling away," and his radar equipment clocked the truck going 83 miles per hour, which was 8 miles per hour above the speed limit.  [Hearing Tr. at 5:12–17].  He activated his emergency equipment and pulled the vehicle over without incident near Mile Marker 70.  [*Id.* at 5:19–24].  The vehicle's driver was Mr. Pita-Chavolla, and Mr. Pacheco sat in the passenger seat.  [Ex. 4 at 7–9]; *see also* [Hearing Tr. at 7:20–8:16 (Trooper St. Onge identifying Defendants)].

Trooper St. Onge approached Defendants' vehicle on foot, identified himself, and discussed the vehicle's insurance status and speed with Mr. Pita-Chavolla through the passenger window.  [Ex. 1 at 01:11–02:00].  Shortly thereafter, Trooper St. Onge stated that he would not be ticketing Mr. Pita-Chavolla, but to "get [him] out of here as quick as possible," asked Mr. Pita-Chavolla to exit the vehicle and return with Trooper St. Onge to his patrol car.  [*Id.* at 03:25–04:00].  Mr. Pita-Chavolla agreed and consented to a search of his person.  [*Id.* at 04:04–04:11].  Trooper St. Onge then sat in the driver's seat of his patrol car, rolled the passenger window down, and spoke to Mr. Pita-Chavolla—who stood outside the passenger window, unrestrained—for nearly fifteen minutes.  [*Id.* at 04:20–18:55].  Throughout the time that Trooper St. Onge spoke with him, Mr. Pita-Chavolla looked for insurance information on his phone, called his girlfriend to assist because she had added the policy, and asked Trooper St. Onge about the details of the

---

12:34 A.M. on January 28.  [Ex. 4 at 6].  To the extent any relevant dispute exists, the Court credits the more specific account in the police report.

"unconfirmed" insurance report.  *See, e.g.*, [*id.* at 07:19–08:12, 15:57–16:31].   Mr. Pacheco remained in the truck.  [Hearing Tr. at 10:2–6].

During his fifteen-minute conversation with Mr. Pita-Chavolla, Trooper St. Onge asked approximately three dozen questions on a variety of topics.  Upon obtaining Mr. Pita-Chavolla's name, date of birth, and address, he learned that Mr. Pita-Chavolla lived in Phoenix.  [Ex. 1 at 05:49–06:04].   Trooper St. Onge then asked if it had been a "long drive" and Mr. Pita-Chavolla indicated that it had; after a pause, he added that he was planning to move to Colorado, where Mr. Pacheco had recently moved and found work, and that he had never lived anywhere with snow, having only seen snow in Flagstaff, Arizona.  [*Id.* at 06:06–06:33].  Asked about the length of the overnight drive from Phoenix to Denver, Mr. Pita-Chavolla stated that it was approximately twelve hours, noting that he and Mr. Pacheco took turns driving.[3]  [*Id.* at 06:51–06:58].  Mr. Pita-Chavolla indicated that he and Mr. Pacheco—his neighbor in Phoenix whom he had known for several years—were traveling to Mr. Pacheco's apartment in Denver, but that Mr. Pita-Chavolla did not know the exact location as it was his first trip to Denver.  [*Id.* at 07:04–07:46, 10:02–10:06, 13:25–13:30].  Mr. Pita-Chavolla explained that he did swimming pool tile work in Phoenix, but work slowed down in December and January.  [*Id.* at 08:15–08:42].  He further stated that he would be staying in Denver for about two weeks, depending on what work was available.  [*Id.* at 09:24–09:40].

About ten minutes into the stop, Trooper St. Onge asked Mr. Pita-Chavolla for his phone number, which Mr. Pita-Chavolla provided.  [*Id.* at 10:14–10:25].  Trooper St. Onge

---

[3] The timeline suggested by Mr. Pita-Chavolla was consistent with both actual driving times from Phoenix and the ALPR data with respect to the vehicle's presence in Holbrook earlier that day.  *See* [Hearing Tr. at 51:20–25].

then asked about the last time Mr. Pita-Chavolla traveled; Mr. Pita-Chavolla replied that he last left Phoenix to visit Flagstaff for Christmas and New Year's.  [*Id.* at 10:41–10:59]. Mr. Pita-Chavolla did not mention going to Las Vegas on January 25, as reflected in the ALPR data corresponding to the truck.  The subject soon changed to the truck:  Trooper St. Onge asked Mr. Pita-Chavolla how "that thing drive[s]," whether Mr. Pita-Chavolla put the lift on himself, and whether doing so was difficult.  [*Id.* at 12:06–12:24].

In response to further questioning, Mr. Pita-Chavolla informed Trooper St. Onge that he planned on doing general construction work in Denver to see how he liked it; Trooper St. Onge opined that Mr. Pita-Chavolla would like Denver, and indicated that he had been living in Colorado for ten years.  [*Id.* at 12:25–13:02].  Another truck-related digression followed, in which Trooper St. Onge described how he "messed up" his last personal vehicle purchase.  [*Id.* at 14:25–15:28].  Trooper St. Onge asked a second time about what kind of work Mr. Pita-Chavolla would be doing in Denver, and Mr. Pita-Chavolla referred to "general construction" and "new building" work, noting that he had only previously done pool renovations.  [*Id.* at 16:50–17:10].

At some point during this exchange, Trooper St. Onge determined that he had developed reasonable suspicion of criminal activity, and he searched Mr. Pita-Chavolla's phone number in a conflicts database to determine whether Mr. Pita-Chavolla was the subject of any other pending investigations.[4]   [Hearing Tr. at 59:5–17].   The search revealed no active cases.  *See* [Ex. 4 at 9].

---

[4] With respect to the timing of the database search, Trooper St. Onge testified that he obtained Mr. Pita-Chavolla's phone number at the 10:18 mark of his bodycam footage and then performed the database search on the patrol car computer before verifying Mr. Pita-Chavolla's VIN.  *See* [*id.* at 53:1–15, 56:17–25].  The bodycam footage indicates that Trooper St. Onge left his vehicle to check the VIN at approximately the 19:00 mark.  *See* [Ex. 1 at 19:00].  Upon review, the record does not fix with specificity the exact moment

Trooper St. Onge told Mr. Pita-Chavolla that he would verify the VIN on Mr. Pita-Chavolla's truck and then return to discuss the vehicle's insurance status. [Ex. 1 at 18:45–18:55].  After checking the VIN on the truck's left side, Trooper St. Onge walked around the front of the truck and engaged Mr. Pacheco in conversation through the passenger window for about a minute.  [*Id.* at 19:12–19:27].  Among other topics, Trooper St. Onge asked Mr. Pacheco how he knew Mr. Pita-Chavolla (they were neighbors), where Defendants were going (Evans & Federal in Denver), whether Mr. Pita-Chavolla was just dropping Mr. Pacheco off ("Yeah.  Well no, he's thinking about moving in with me, actually."), whether Mr. Pacheco was from Denver (no), whether Mr. Pacheco had been to Denver (yes), whether Mr. Pacheco knew Denver's layout (he relied on his phone to navigate), and whether Defendants had work lined up in town (yes).  [*Id.* at 19:29–20:44].  Returning to the patrol car, Trooper St. Onge said to himself that Defendants' stories conflicted and that he had developed reasonable suspicion "for sure."  [*Id.* at 20:48–21:04].  Back in his vehicle, he shifted his focus to preparing a consent-to-search form. [*Id.* at 22:05–23:47].

After completing the form, Trooper St. Onge approached Mr. Pita-Chavolla, asking if Mr. Pita-Chavolla knew what Trooper St. Onge did for work.  [*Id.* at 23:47–24:00]. Trooper St. Onge explained that his "primary job" was interstate drug interdiction and he asked whether Mr. Pita-Chavolla's truck contained any drugs or weapons.  [*Id.* at 24:01–24:30].  Mr. Pita-Chavolla indicated that his only belongings in the vehicle were a jacket and a blanket.  [*Id.* at 24:35–24:48].  Trooper St. Onge sought consent to search the

---

within that nine-minute interval when Trooper St. Onge searched the database.  For purposes of this Order, the Court assumes without deciding that Trooper St. Onge's search occurred at the latest possible moment, just before he left his vehicle.

vehicle and Mr. Pita-Chavolla declined.   [*Id.* at 24:50–25:07].   Trooper St. Onge then called for a canine sniff.   [*Id.* at 25:56–26:04].

Around twenty minutes later, Trooper Stephen Wall ("Trooper Wall"), a canine handler, arrived on the scene with his canine Jax. [Hearing Tr. at 65:8–13].  By this point, Trooper St. Onge's supervisor Sergeant Tom Taylor had also arrived.  [*Id.* at 65:8–11]. Trooper Wall started working with Jax in February 2020, and Jax was trained to detect heroin, methamphetamine, and cocaine.   [*Id.* at 73:25–74:8].   After speaking with Defendants outside Mr. Pita-Chavolla's truck, Trooper Wall led Jax through a free-air sniff of the vehicle.   [*Id.* at 82:24–83:2].   Trooper Wall determined that Jax alerted to the presence of narcotics, so Troopers Wall and St. Onge searched the vehicle. [*Id.* at 83:14–21, 85:13–19]; *see also* [Ex. 3 at 04:30–08:00].   Under the rear seat, the officers uncovered packages containing more than thirty pounds of methamphetamine and fentanyl pills.  [Hearing Tr. at 22:9–23:2].

On March 10, 2023, an indictment was filed charging both Defendants with three drug-related offenses. *See* [Doc. 1].  Defendants made their initial appearances on March 15, 2023, and were both arraigned on March 20, 2023.  [Doc. 6; Doc. 9; Doc. 14; Doc. 16].  The Court set this case for a five-day jury trial beginning on May 15, 2023.  [Doc. 21].  The trial date was postponed on motion several times, consistent with the Speedy Trial Act, most recently to December 11, 2023.   [Doc. 34].   The Court subsequently vacated the trial date pending resolution of Defendants' motions, filed October 30, 2023. [Doc. 42].

## LEGAL STANDARDS

### I.      Fourth Amendment

The Fourth Amendment to the United States Constitution "protects the people from unreasonable searches and seizures of 'their persons, houses, papers, and effects.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 62 (1992) (quoting U.S. Const. amend. IV).   The "principal judicial remedy to deter Fourth Amendment violations" is the exclusionary rule, which "often requires trial courts to exclude unlawfully seized evidence in a criminal trial." *Utah v. Strieff*, 579 U.S. 232, 237 (2016).

"A routine traffic stop is a seizure and is treated as an investigative detention under the Fourth Amendment."  *United States v. Leon*, 80 F.4th 1160, 1164 (10th Cir. 2023). Such stops "must be justified at [their] inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself." *United States v. Cates*, 73 F.4th 795, 805 (10th Cir. 2023) (quotation omitted). Accordingly, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns."  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted).

Unless a detained individual consents, "[a]n officer may not prolong the traffic stop to conduct an unrelated investigation without reasonable suspicion that the detainee is engaged in criminal activity.  The moment at which this reasonable suspicion becomes necessary is known as the '*Rodriguez* moment.'"  *Leon*, 80 F.4th at 1165 (citations omitted); *see also Rodriguez*, 575 U.S. at 355 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop.  But . . . he may not do so in a

way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.").  The Tenth Circuit has explained that, "[u]nder *Rodriguez*, . . . an unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion."  *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022).

Reasonable suspicion is based on the totality of the circumstances and gets at "whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."  *Leon*, 80 F.4th at 1165 (quotation omitted).  The Government bears the burden with respect to reasonable suspicion.  *United States v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018).  "Given the specialized training and experience that law enforcement officers have, we generally defer to their ability to distinguish between innocent and suspicious behavior, but deference becomes inappropriate 'when an officer relies on a circumstance incorrigibly free of associations with criminal activity.'"  *Frazier*, 30 F.4th at 1174 (quoting *United States v. Santos*, 403 F.3d 1120, 1133 (10th Cir. 2005)).  Any "[f]acts learned later in the investigation," after the *Rodriguez* moment has passed, "are irrelevant" to the Court's assessment of reasonable suspicion at the point the stop is prolonged.  *Id.* at 1179.

## II.   Fifth Amendment

The Fifth Amendment protects criminal defendants from compelled self-incrimination.  *See* U.S. Const. amend. V.  As a "prophylactic rule" that is "employed to protect against violations of the Self–Incrimination Clause," *United States v. Patane*, 542 U.S. 630, 636 (2004), the Supreme Court's decision in *Miranda v. Arizona* requires law

enforcement officers to provide certain warnings to individuals before engaging in "custodial interrogation," *see United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  Unwarned statements are often inadmissible in evidence under the exclusionary rule.  *See Oregon v. Elstad*, 470 U.S. 298, 306 (1985).

"Traffic stops do not usually implicate *Miranda* concerns, since a traffic stop is typically noncoercive and nonthreatening."  *United States v. Benard*, 680 F.3d 1206, 1211–12 (10th Cir. 2012); *see also Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (declining to adopt a per se rule that traffic stops constitute custodial interrogation). Although "motorists subjected to garden-variety traffic stops—reasonable seizures within the meaning of the Fourth Amendment—are not entitled to *Miranda* warnings," *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007), the Supreme Court has held, with respect to *Miranda*'s "custody" element, that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*," *Berkemer*, 468 U.S. at 440.

## ANALYSIS

Invoking the exclusionary rule, Defendants have filed several motions to suppress physical evidence and statements in this case based on constitutional violations.  *See* [Doc. 36; Doc. 38; Doc. 39].

## I.    Traffic Stop

The Parties do not dispute that the initial stop by Trooper St. Onge, premised on Mr. Pita-Chavolla's violation of traffic laws related to speeding and insurance, was

consistent with the Fourth Amendment.  *See* [Hearing Tr. at 185:24–186:3]; *see also Whren v. United States*, 517 U.S. 806, 813 (1996) (rejecting "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved").   Instead, the Parties focus on whether the stop was improperly prolonged without reasonable suspicion under *Rodriguez*.   Parsing their arguments requires the Court to determine (1) when any *Rodriguez* moment occurred and (2) if such a moment occurred, whether objective and particularized reasonable suspicion existed at that time.

### A.     *Rodriguez* Moment

In his brief, Mr. Pacheco primarily contended that the *Rodriguez* moment—the point at which the stop was prolonged in furtherance of general criminal interdiction efforts—occurred when, after speaking with Mr. Pacheco, Trooper St. Onge stated aloud that he had reasonable suspicion of criminal activity and then prepared a consent-to-search form.  *See* [Doc. 36 at 6].  This took place around twenty-one minutes into the stop.  Mr. Pita-Chavolla's brief is ambiguous with respect to when the *Rodriguez* moment occurred.  *See* [Doc. 38 at 11–12].   Following Trooper St. Onge's testimony at the evidentiary hearing, Defendants' focus largely shifted to when Trooper St. Onge ran Mr. Pita-Chavolla's phone number through the deconfliction database, *see, e.g.*, [Hearing Tr. at 194:19–22], which occurred somewhere between ten and nineteen minutes into the stop, *see supra*, n.4.  The latter window excludes Trooper St. Onge's conversation with Mr. Pacheco at the truck's passenger window, which the Government relies, in part, upon to meet its burden as to reasonable suspicion.  *See, e.g.*, [Doc. 47 at 9–10].

"[W]hether the alleged detour prolonged the traffic stop" is a question that is "factual, not legal." *United States v. Malone*, 10 F.4th 1120, 1124 (10th Cir. 2021). "An officer's mission during a traffic stop includes addressing the traffic violation that warranted the stop *and* 'ordinary inquiries incident to the traffic stop,' such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *United States v. Dawson*, 90 F.4th 1286, 1291 (10th Cir. 2024) (quoting *Rodriguez*, 575 U.S. at 355). For example, "an officer's decision to run a criminal-history check on an occupant of a vehicle after initiating a traffic stop is justifiable as a negligibly burdensome precaution consistent with the important governmental interest in officer safety." *See United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020) (quotation omitted). Similarly, "a rental agreement check is not the kind of 'unrelated investigation' that offends the Fourth Amendment when conducted in a way that lengthens the stop" because it is "closely tied to traffic enforcement and is properly characterized as part of an officer's 'traffic mission' when he conducts a stop on a rental vehicle." *Dawson*, 90 F.4th at 1292 (quoting *Rodriguez*, 575 U.S. at 354, 356).

In contrast, "[a]ctivities that lack a 'close connection to roadway safety,' . . . are not part of an officer's traffic mission and must be supported by independent reasonable suspicion." *Id.* at 1291 (quoting *Rodriguez*, 575 U.S. at 355). "What law enforcement may not do" during a traffic stop "is divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes." *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020); *see also United States v. Lara*, No. 21-8091, 2023 WL 2250788, at *1 (10th Cir. Feb. 27, 2023) ("[T]he Fourth Amendment prohibits law

enforcement officers from unduly delaying traffic stops to investigate other, unrelated crimes.").  If law enforcement diverts from traffic enforcement in a way that prolongs the stop, the *Rodriguez* moment has occurred, and the officer must have either reasonable suspicion of criminal activity or the motorist's consent.

The Court finds Trooper St. Onge's sworn testimony significant with respect to ascertaining the *Rodriguez* moment.  At the evidentiary hearing in this matter, Trooper St. Onge agreed with defense counsel that he "divert[ed] from the traffic stop . . . to investigate other criminal activity" when he searched Mr. Pita-Chavolla's phone number in the conflicts database to further his drug interdiction work.  *See* [Hearing Tr. at 52:7–12].  In recounting the events of the traffic stop, he stated:  "I take the phone number, and I did not enter it [into the database] until I believe I established reasonable suspicion because obviously that would be an investigation at that point."  [*Id.* at 52:23–25].  The Court notes the following exchange between Trooper St. Onge and defense counsel:

> **Q.**  And it is important for your purposes to know exactly when you hit reasonable suspicion because that is what allows to you get away from the traffic stop mission and go into [the] interdiction mission?
> **A.**  That's correct.
> **Q.**  So when you say in your bodycam [after speaking with Mr. Pacheco] hey I think I have reasonable suspicion you actually had previously determined you did?
> **A.**  That's correct.
> **Q.**  Because you would not have entered the phone number into the [database] if you didn't think you had reasonable suspicion?
> **A.**  Yes.
> **Q.**  Because you knew at that point you know that is a diversion from writing a ticket?
> **A.**  Yes, ma'am.
> **Q.**  And you know you can't do that?
> **A.**  That's correct.

[*Id.* at 58:25–59:17].

Perhaps because of this testimony, the Government did not argue at the hearing that the database search was "justifiable as a negligibly burdensome precaution consistent with the important governmental interest in officer safety" under Tenth Circuit law. *See Mayville*, 955 F.3d at 830 (quotation omitted). Instead, when the Court inquired about how the database search fit into the *Rodriguez*-moment analysis, counsel for the Government took the position that reasonable suspicion existed at that point. *See* [Hearing Tr. at 208:12–19]; *see also* [*id.* at 210:9–14]. Faced with unrebutted, sworn testimony by the law enforcement officer controlling this encounter that he diverted from the traffic enforcement mission which justified stopping Defendants to pursue a drug investigation, the Court is respectfully constrained to conclude that the *Rodriguez* moment occurred when Trooper St. Onge says it occurred: that is, when Trooper St. Onge ran Mr. Pita-Chavolla's phone number through the conflicts database before stepping out of his vehicle. *See* [Doc. 38 at 11–12 (arguing that Trooper St. Onge's "extension of the stop went beyond ordinary inquiries and checks," with "nothing to do with the alleged traffic violation")]; *cf. also Frazier*, 30 F.4th at 1173 ("[E]ach minute that the trooper spent arranging the dog sniff was time the citation-related tasks went unaddressed."). The record does not reflect precisely how much time the database search took, but "[e]ven *de minimis* delays caused by unrelated inquiries violate the Fourth Amendment." *Mayville*, 955 F.3d at 830.

The Government argues that the stop "would have lasted that long either way"— that is, that the encounter would have continued for the same duration without regard to whether Trooper St. Onge performed the database search at all—because Mr. Pita-Chavolla continued to search for his insurance information while Trooper St. Onge

questioned him.  *See* [Hearing Tr. at 207:25–208:6].  But "[t]he critical question" under *Rodriguez* "is not whether the [diversion] occurs before or after the officer issues a ticket, . . . but whether [it] prolongs—i.e., adds time to—the stop."  *Rodriguez*, 575 U.S. at 357 (quotation omitted).  Not only did Trooper St. Onge testify that he diverted from traffic enforcement to pursue a drug interdiction investigation, but, as counsel for Mr. Pacheco pointed out, he further testified that Mr. Pita-Chavolla was looking for the insurance information "on his own" accord, and not at Trooper St. Onge's direction.  [Hearing Tr. at 70:9–19]; *see also* [*id.* at 216:13–19].  These circumstances distinguish this case from Tenth Circuit cases—not relied upon or even cited by the Government in its brief or at oral argument—finding that law enforcements officers did not prolong stops where motorists driving rental cars were looking for rental agreements.  For example, in *United States v. Cates*, the Tenth Circuit found that the "district court properly applied *Rodriguez* and concluded that [the officer] stayed on task by diligently pursuing the mission of the traffic stop."  *Cates*, 73 F.4th at 808.  In contrast, the Court has heard Trooper St. Onge's testimony that he diverted from traffic enforcement to pursue a drug interdiction investigation because he believed he had reasonable suspicion.  Setting aside Trooper St. Onge's diligence, the notion that Mr. Pita-Chavolla's insurance search vitiates *Rodriguez* is inconsistent with the Government's suggestion that the *Rodriguez* moment occurred when Trooper St. Onge prepared the consent-to-search form, *see* [Hearing Tr. at 207:9–15], a time at which Mr. Pita-Chavolla continued to look for his insurance, *see* [Ex. 1 at 22:15–22:20].  The Government has not shown that Mr. Pita-Chavolla's attempts to find his insurance policy justify the duration of the stop.[5]

---

[5] Following the evidentiary hearing in this matter, the Tenth Circuit issued its decision in *Hoskins v. Withers*, ___ F.4th ___, No. 22-4081, 2024 WL 677076 (10th Cir. Feb. 20,

The Court's conclusion that the *Rodriguez* moment occurred when Trooper St. Onge accessed the conflicts database is bolstered by testimony suggesting that, up to that point, the stop's ostensible traffic-based mission was not Trooper St. Onge's priority. *See* [Hearing Tr. at 29:21–24 (Trooper St. Onge agreeing with the question "you pull over cars but you are really looking for other evidence of criminal activity while you are doing so?"); *id.* at 47:24–48:18 (Trooper St. Onge agreeing that, in conversing with Mr. Pita-Chavolla, he was "trying to develop reasonable suspicion for a drug investigation," with the conversation "done with purpose" and covering "things that [did not] relate to giving

---

2024), which extended *Cates* to certain situations in which motorists search for insurance information.  In *Hoskins*, the Tenth Circuit held that an officer did not prolong a traffic stop for purposes of *Rodriguez* by conducting a dog sniff while a motorist "was still looking for his proof of insurance," because "the traffic stop would have taken the same amount of time with or without the dog sniff."  *Id.* at *6.  The Court finds *Hoskins* distinguishable for largely the same reasons that *Cates* is distinguishable; namely, Trooper St. Onge credibly testified—and the Court finds as fact—that he had diverted his law enforcement efforts to drug interdiction by this point in the interaction, notwithstanding Mr. Pita-Chavolla's ongoing search for insurance.  Accordingly, the Court cannot conclude that Trooper St. Onge was reasonably diligent in pursuing the stop's mission, or that the stop would have taken the same amount of time with or without the database search, merely because Mr. Pita-Chavolla happened to be looking for the information on his own volition.  Instead, consistent with Trooper St. Onge's testimony, it seems that the stop was no longer about traffic at all.  The evidence does not suggest that Trooper St. Onge was waiting for Mr. Pita-Chavolla to locate his insurance information in a way that bore upon the timeline of the interaction or affected the scope of the officer's permissible conduct, as in *Hoskins*. Rather, the evidence suggests that Trooper St. Onge had been waiting to divert from traffic enforcement until he developed reasonable suspicion of drug trafficking, which he testified had occurred by the point of the database search.  Thus, unlike in *Hoskins*, where the court stressed that, at the time the dog sniff took place, "dispatch had not yet reported on the existence of outstanding warrants or the status of the driver's license," *id.* at *5, here Trooper St. Onge was effectively done with traffic enforcement by the time he investigated Mr. Pita-Chavolla in the conflicts database.  This necessarily prolonged the stop.  Although bodycam footage shows that Trooper St. Onge subsequently approached Mr. Pita-Chavolla's truck to check the VIN on the driver's side, the Court notes that he then walked around the front of the truck, engaged Mr. Pacheco in conversation for about a minute, and set about preparing a search form.

any speeding warning" but rather furthered drug interdiction efforts)]. Redirect examination included the following exchange with counsel for the Government:

> **Q.** I want to clarify something that you . . . stated on cross-examination. When you are talking to Mr. Pita-Chavolla and he is outside the car and you are working on the paperwork, were all of the questions you asked with the goal of this interdiction drug stop?
> **A.** Yes, ma'am.
> **Q.** Well, did you ask him about his truck for the purpose of putting ram or Dodge Ram or whatever on the paperwork?
> **A.** I did, yes.
> **Q.** And were you also just making small talk about some things?
> **A.** Yes, ma'am.
> **Q.** So not all of this was directed at a drug investigation or developing reasonable suspicion?
> **A.** I guess not, no, no.

[*Id.* at 71:2–16]. And Trooper St. Onge did not access Mr. Pita-Chavolla's driving record at any point during the hourlong traffic stop. [*Id.* at 37:17–38:4].

Trooper St. Onge's testimony appears to cover dozens of questions he posed Mr. Pita-Chavolla before investigating the phone number, and it seems to distinguish this case from many that authorize off-topic questioning. *See, e.g.*, *Cortez*, 965 F.3d at 839 (finding that "questions relating to whether [the defendant] was working in Douglas, whom she was staying with while there, and what her boyfriend did for a living [were] farther afield," but "permissible as the type of 'negligibly burdensome' inquiries directed at ensuring officer safety," where officer testified that "he routinely asks innocuous background questions to assess driver stress, nervousness, and evasiveness to help gauge the degree of caution necessary in conducting a stop"). Here, Trooper St. Onge testified that he asked his questions to further his drug interdiction investigation, not to

ensure his safety during the stop. *See, e.g.*, [Hearing Tr. at 47:24–48:18].[6] To the extent certain questions may have been asked to assess the truthfulness of Mr. Pita-Chavolla's responses to other questions, *see* [Ex. 4 at 8], that furthered the drug interdiction investigation, not the traffic stop.

Based on this evidence, defense counsel suggested at oral argument that the Court could reasonably conclude that the *Rodriguez* moment occurred even earlier than the conflicts database search. *See* [Hearing Tr. at 194:5–18]. However, the Court need not reach this argument because, as discussed below, fixing the *Rodriguez* moment at the database search still leads to a conclusion that Defendants' motions should be granted with respect to the stop's prolongation. Nonetheless, the Court notes that the evidence in this case appears to call into question the extent to which Trooper St. Onge was reasonably diligent in pursuing the traffic-based mission that permitted the stop, as Supreme Court and Tenth Circuit precedent require. *Cf. Cortez*, 965 F.3d at 840 (noting that "inquiries fail[ed] to relate to the mission of the stop" where "[t]hey neither helped investigate the original infraction—speeding—nor could they reasonably be characterized as relating to officer safety"). Such evidence supports the Court's finding that the *Rodriguez* moment occurred no later than when Trooper St. Onge ran the database search.

In reaching this result, the Court is mindful of the Tenth Circuit's teaching that "*Rodriguez* does not require courts to second-guess the logistical decisions of officers so long as their actions were reasonable and diligently completed within the confines of a

---

[6] In contrast, Trooper St. Onge's testimony indicated that approaching Defendants' car on the right side and patting down Mr. Pita-Chavolla were both safety measures. *See* [Hearing Tr. at 42:20–25, 45:11–15].

lawful traffic stop." *Mayville*, 955 F.3d at 827. Here, Trooper St. Onge's unrebutted testimony establishes that he intentionally prolonged the stop at issue, consciously diverting from pursuing its traffic-based purpose or addressing any attendant officer-safety concerns, by investigating Mr. Pita-Chavolla's phone number in a conflicts database to further his drug interdiction mission. *Cf. id.* at 831 ("[O]fficers may not undertake safety precautions for the purpose of lengthening the stop to allow for investigation of unrelated criminal activity."). Unlike *Mayville*, where the "evidence . . . show[ed] the troopers acted reasonably diligent in executing the tasks incident to the traffic stop, and their actions did not unlawfully extend the stop beyond the pursuit of the stop's mission," *id.* at 832, the evidence before this Court—especially Trooper St. Onge's own testimony and the bodycam footage—indicates that Trooper St. Onge deliberately extended this stop, in a way that he believed required reasonable suspicion, by searching the conflicts database.

### B.    Reasonable Suspicion

With the factual question of when the stop was prolonged resolved, the Court shifts to the legal question of whether Trooper St. Onge had particularized and objective reasonable suspicion of criminal activity at the *Rodriguez* moment.[7] The Government's arguments and Trooper St. Onge's testimony suggest several factors contributing to Trooper St. Onge's suspicions at that point: (1) Mr. Pita-Chavolla offering information about his travel plans, which Trooper St. Onge viewed as indicative of a cover story; (2) Mr. Pita-Chavolla supposedly changing the subject when asked about his last trip

---

[7] A traffic stop may also be extended based upon motorist consent. *See United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015). The Government does not argue consent here. *See generally* [Doc. 47].

outside Phoenix; and (3) Mr. Pita-Chavolla stating that he last left Phoenix in late December to visit Flagstaff, despite license plate readers capturing his truck in Las Vegas that same week, which Trooper St. Onge took as a suspicious inconsistency in light of the trip's proximity, duration, and concealment.[8] *See* [Doc. 47 at 8–10; Hearing Tr. at 54:22–55:1, 207:9–211:7].

The Court begins with the initial exchange between Trooper St. Onge and Mr. Pita-Chavolla, in which Mr. Pita-Chavolla explained that he was planning to move to Denver, where his neighbor Mr. Pacheco had relocated. The Court is hesitant to find that Mr. Pita-Chavolla's statements support reasonable suspicion of drug trafficking on a hunch that they formed a cover story.[9] As the Tenth Circuit has explained, "[o]rdinarily, citizens stopped for traffic violations would not . . . display a reluctance to discuss [their traveling companions] or their relationship with them." *Cortez*, 965 F.3d at 835–36. *United States v. Leon*, in which the court reversed the denial of a motion to suppress, is instructive with respect to the role of a motorist's behavior:

> Mr. Leon exhibited no physical manifestations of extreme nervousness. He was cooperative and offered explanations to questions posed by Trooper Gosnell. Trooper Gosnell may have thought Mr. Leon offered an inordinate amount of detail or engaged in unnecessary conversation, but we conclude that it was natural for Mr. Leon to offer additional information as Trooper Gosnell inquired into Mr. Leon's ties to Minnesota and his authority to operate the vehicle. The indicia of nervousness highlighted by Trooper Gosnell could also merely reflect Mr. Leon's communication style rather than nervousness. Although we owe deference to Trooper Gosnell's

---

[8] In his police report, Trooper St. Onge pointed to several other factors informing his suspicions. *See generally* [Ex. 4]. Because the Government does not rely on these considerations to meet its burden as to reasonable suspicion, the Court does not discuss them in detail.

[9] The Government has not pressed this factor in its briefing or at argument. The Court discusses it primarily because of the emphasis placed on it by Trooper St. Onge. *See, e.g.*, [Hearing Tr. at 54:22–55:1; Ex. 4 at 7].

> training and experience, Mr. Leon's alleged nervousness was not extreme
> and bears negligible weight in our calculus.

*Leon*, 80 F.4th at 1168 (citation omitted).  Here, Trooper St. Onge has not suggested that

Mr. Pita-Chavolla was nervous—merely that he volunteered information.  But Trooper St.

Onge also testified that he is trained to conduct himself in a manner that specifically

encourages motorists to volunteer information.  *See* [Hearing Tr. at 49:17–50:1].

The Court has reviewed the bodycam footage and finds that Mr. Pita-Chavolla's

elaboration on his travel plans was consistent with how he conducted himself throughout

the conversation.  *See, e.g.*, [Ex. 1 at 13:25–13:40 (asked how long he has known Mr.

Pacheco, Mr. Pita-Chavolla responding "probably like for like five years, it's been maybe

like for five years since.  Well, I lived at the house first and then the neighbors moved out,

and then that's when they moved in.  That's how I met him.  He lives like right next to me,

like the next house over.")].  As counsel for Mr. Pacheco notes, Mr. Pita-Chavolla was

"responsive and conversational" throughout several lengthy exchanges with Trooper St.

Onge.  [Doc. 36 at 2–3]; *see also United States v. Simpson*, 609 F.3d 1140, 1147–48

(10th Cir. 2010) ("[U]nless the police officer has had significant knowledge of a person, it

is difficult, even for a skilled police officer, to evaluate whether a person is acting normally

for them or nervously.").   Accordingly, the Court assigns Mr. Pita-Chavolla's

conversational attitude, and Trooper St. Onge's hunch that Mr. Pita-Chavolla was

fabricating a cover story by providing information about his travel plans, little to no weight

in the reasonable-suspicion calculus.

The same is true with respect to the Government's argument that Mr. Pita-Chavolla

"was being evasive in trying to divert the conversation" with Trooper St. Onge from the

subject of recent travel.  See [Hearing Tr. at 210:17–18].  Upon review of the evidentiary record, the Court respectfully disagrees with this argument's factual premise.

According to the bodycam footage, the following conversation took place between Trooper St. Onge and Mr. Pita-Chavolla:

> **Trooper St. Onge:**  When's the last time you left Phoenix?
> **Mr. Pita-Chavolla:**  What was that?
> **Trooper St. Onge:**  When was the last time you left Phoenix?
> **Mr. Pita-Chavolla:**  Well tonight, last night, we left.  Came this way.
> **Trooper St. Onge:**  Okay.
> **Mr. Pita-Chavolla:**  Oh the last time, you mean?  Like the last time I traveled, or?
> **Trooper St. Onge:**  Yeah.
> **Mr. Pita-Chavolla:**  Probably like for Christmas, went up to Flagstaff.
> **Trooper St. Onge:**  Okay.
> **Mr. Pita-Chavolla:**  For New Year's, we were out there for New Year's as well.
> (pause)
> **Trooper St. Onge:**  Flagstaff's beautiful, dude.
> **Mr. Pita-Chavolla:**  Yeah, I like it.  But, I mean, it's cold up there too.
> **Trooper St. Onge:**  Yeah.
> **Mr. Pita-Chavolla:**  He was telling me that it snows more over here than in Flagstaff.  Is that true, or?

[Ex. 1 at 10:41–11:13].  The Government contended at oral argument that, in this exchange, Mr. Pita-Chavolla "directs the conversation away from [the] trip" to Flagstaff. *See* [Hearing Tr. at 209:9].  Similarly, Trooper St. Onge's police report states that Mr. Pita-Chavolla "redirected the conversation away from his travel plans and to the snow in Denver and how it relates to the snowfall in Flagstaff." [Ex. 4 at 8].  However, the bodycam footage reveals that it was Trooper St. Onge who changed the subject.  Following a short pause, Trooper St. Onge brought up conditions in Flagstaff, and Mr. Pita-Chavolla pursued this topic by discussing how conditions in Flagstaff compared to conditions in Denver, something he was apparently just discussing with Mr. Pacheco.  In this vein, mere moments before discussing recent travels, Mr. Pita-Chavolla and Trooper St. Onge

had covered how Denver compares to Phoenix with respect to population and rent prices. *See* [Ex. 1 at 09:40–10:00]. This focus on comparing familiar cities to Denver was consistent with Mr. Pita-Chavolla's statements that he was planning on moving to Denver, but that this would be his first visit. The Court finds that Mr. Pita-Chavolla did not divert attention from his trip to Flagstaff in a manner that supported objectively reasonable suspicion of criminal activity, and further notes that Trooper St. Onge asked no follow-up questions on this subject and made no attempts later in the conversation to discuss Mr. Pita-Chavolla's recent travel.[10]

Next and most significantly, the Government argues that Trooper St. Onge had reasonable suspicion to perform the database search based on Mr. Pita-Chavolla's vehicle's presence in Las Vegas the week of the stop, and an inconsistency created by Mr. Pita-Chavolla's self-reported travel history. License plate data captured Mr. Pita-Chavolla's truck in Las Vegas three days before the stop, and in Phoenix the day before that, but Mr. Pita-Chavolla identified his last trip outside Phoenix as Flagstaff several weeks earlier. For the reasons that follow, the Court respectfully concludes that Trooper St. Onge's underdeveloped hunches arising from the ALPR data and Mr. Pita-Chavolla's statements did not create sufficient objective and particularized reasonable suspicion to justify extending Defendants' detention under the totality of the circumstances.

Under applicable case law, the mere fact of traveling to Las Vegas is not entitled to any weight, but both the duration of the trip and any attempt to conceal it could be relevant. As to the first point, Tenth Circuit precedent is clear that "the characterization

---

[10] In contrast, Trooper St. Onge subsequently asked Mr. Pita-Chavolla twice about what kind of work he and Mr. Pacheco would be doing in Denver. *See* [Ex. 1 at 12:25–12:32, 16:50–16:58].

of [locations] as drug hubs or destinations adds nothing to the reasonable suspicion calculus." *Leon*, 80 F.4th at 1166.[11]  Indeed, this holding has been applied in the specific context of travel from Las Vegas.  *See United States v. White*, 584 F.3d 935, 951–52 (10th Cir. 2009) (noting, where motorists traveled from Las Vegas, that "[b]ecause law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, . . . the probativeness of a particular defendant's route is minimal").  At the same time, courts have found that making "a long trip—only to stay at [a] destination for . . . a short amount of time—is also consistent with the behavior of a drug courier." *United States v. Batara-Molina*, 60 F.4th 1251, 1257 (10th Cir. 2023).  And the Tenth Circuit has further advised district courts that "lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion," *Simpson*, 609 F.3d at 1149, although the subject matter of the lie can be relevant to the calculus, *see, e.g.*, *United States v. Moore*, 795 F.3d 1224, 1230 (10th Cir. 2015) (noting that, where "a defendant lies about having a criminal history," such criminal history can be an especially "powerful contributor to the reasonable suspicion analysis").  The Court recognizes that if Trooper St. Onge knew that Mr. Pita-Chavolla was concealing additional interstate travel in the same week, or that he had engaged in time-consuming travel with a fast turnaround, that could meaningfully contribute to the reasonableness of his suspicions.

---

[11] For this reason, the Court assigns no weight to Trooper St. Onge's observations in his police report about Phoenix being "a source location for illegal drugs coming to Colorado." [Ex. 4 at 6].  The Court further notes that the Government has not relied on this rationale. *See generally* [Doc. 47].

At the outset, the Court notes that Mr. Pita-Chavolla's self-reported description of his last trip outside Phoenix was specific with respect to both time and place. *Compare* [Ex. 1 at 10:41–11:00 (describing holiday travel to Flagstaff)], *with Simpson*, 609 F.3d at 1150 ("[V]ague, inconsistent or evasive answers with respect to travel plans [may be] supportive of reasonable suspicion."). He indicated that he most recently left Phoenix to visit Flagstaff, Arizona, for Christmas and New Year's in late 2022 and early 2023. Trooper St. Onge's only reason to doubt Mr. Pita-Chavolla's response was the ALPR data placing the truck in Las Vegas on January 25. However, Trooper St. Onge recognized on cross-examination that the ALPR data disclosing the vehicle's presence did not actually reveal its driver or occupants. *Compare* [Hearing Tr. at 36:15–25 (Trooper St. Onge testifying that the license plate data included only the "license plate itself" and "a rear panel" of the vehicle)], *with United States v. Hayes*, 62 F.4th 1271, 1279 (10th Cir. 2023) (Briscoe, J., concurring) (finding reasonable suspicion based on individual's travel as confirmed by cellular "location data . . . and surveillance"), *and United States v. Sanchez*, 13 F.4th 1063, 1072 (10th Cir. 2021) (reasonable suspicion supported where officer "knew" defendant was lying). Respectfully, the Government's position that Trooper St. Onge knew Mr. Pita-Chavolla was lying about his recent travel history overstates Trooper St. Onge's knowledge both by the officer's own admission and any objective measure. *See* [Doc. 47 at 9]; *see also* [Hearing Tr. at 36:15–25].

While Mr. Pita-Chavolla's statement and the ALPR data created a potential discrepancy, Trooper St. Onge did not explore it. *See Leon*, 80 F.4th at 1166 ("Further questioning may have elicited inconsistencies or vagueness, but we cannot say that [the] answers to questions actually asked contributed to reasonable suspicion."); *United States*

*v. Lopez*, 849 F.3d 921, 926–27 (10th Cir. 2017) (noting, in reversing the denial of a motion to suppress, that "[p]erhaps additional questioning . . . would have elicited internal contradictions, inconsistencies between [defendants'] stories, or inexplicable vagueness," but the officer "did very little to pursue his suspicions, and he uncovered no flaws of that nature").   Without further development, this potential discrepancy "can readily be explained and is so innocent or susceptible to varying interpretations as to be innocuous." *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) (quotation omitted). Critically, Trooper St. Onge had no evidence that Mr. Pita-Chavolla or Mr. Pacheco drove the subject vehicle to Las Vegas.  *See United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (reasonable suspicion requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity" (quotation omitted)).   But Trooper St. Onge did know (1) that, according to Mr. Pita-Chavolla, he and Mr. Pacheco had alternated driving during the trip from Phoenix, *see* [Ex. 1 at 06:40–07:00], suggesting that other individuals were permitted to drive the vehicle; (2) that Mr. Pita-Chavolla called his girlfriend to obtain the vehicle's insurance, which she had added, *see* [*id.* at 07:19– 08:12], suggesting that other individuals had access to the vehicle; and (3) that ALPR data otherwise confirmed the overnight itinerary described by Mr. Pita-Chavolla with respect to the trip from Phoenix, *see* [Hearing Tr. at 51:20–25], suggesting accuracy and reliability with respect to the travel history he relayed.

Additionally, while short stays on long journeys may give rise to reasonable suspicion based on irregular travel plans, *see, e.g.*, *Batara-Molina*, 60 F.4th at 1257, the Court notes that the ALPR data did not necessarily show the kind of quick turnaround that other courts have highlighted.  The license plate readings reviewed by Trooper St. Onge

placed the subject vehicle, which is registered in Arizona, in Phoenix on January 24, in Las Vegas on January 25, and then in Holbrook very early on January 28. These data points are as consistent with a two- or three-night stay in Las Vegas as they are with an immediate return from Las Vegas to Phoenix. And, in the former scenario, stopping briefly at home between road trips is distinct from the typical fact pattern where a short stay at a distant destination is deemed suspicious. *See, e.g.*, *Simpson*, 609 F.3d at 1151–52 ("That Mr. Simpson chose to drive a long distance to spend a single night in Reno and could not easily recount when he left or when he planned to return, contributes to a finding of suspiciousness."); *United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("While a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion, here there was more: surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July."). The Government states in its briefing that Las Vegas "stood out to Trooper St. Onge as a very quick trip," [Doc. 47 at 2], but the Government and Trooper St. Onge ignore that the information available did not actually disclose the length of the stay. If anything, the data confirmed Mr. Pita-Chavolla's statements about living in Phoenix. In other words, Trooper St. Onge's hunch that the trip to Las Vegas—approximately five hours from Phoenix[12]—was suspiciously short is not borne out by the ALPR readings. The Court further notes that the cases finding a motorist's itinerary suspect tend to involve a police officer basing his suspicions on the motorist's self-reported travel timeline, *see, e.g.*, *Batara-Molina*, 60 F.4th at 1253, as

---

[12] Although Trooper St. Onge testified that he believes Las Vegas is "6 or 7 hours" from Phoenix by car, [Hearing Tr. at 14:2–4], the Court takes judicial notice of the fact that the drive takes under five hours, *see United States v. Orozco-Rivas*, 810 F. App'x 660, 668 n.7 (10th Cir. 2020) (taking judicial notice of travel times calculated using Google Maps).

opposed to assumptions about travel belied by the motorist's story.  And Mr. Pita-Chavolla indicated that he would be staying in Denver for several weeks, so his self-reported Denver itinerary provides no basis for reasonable suspicion.

Trooper St. Onge did not take sufficient steps to render any suspicions arising from the ALPR data or Mr. Pita-Chavolla's statements objectively reasonable.  *Cf. Leon*, 80 F.4th at 1169 ("By responding positively and not inquiring further into the identity of the seller, Trooper Gosnell conveyed that he had the information he wanted.").  "In light of the many wholly innocent explanations for" the truck's presence in Las Vegas and Mr. Pita-Chavolla's failure to disclose it—explanations which were neither ruled out nor explored amid dozens of questions posed by Trooper St. Onge—this potential inconsistency "adds nothing to the calculus."  *Santos*, 403 F.3d at 1133; *see also Simpson*, 609 F.3d at 1152 ("[S]uspiciousness cannot be based simply on the fact that a person is making unusual travel plans, or plans that an officer would not have chosen to make.").  Law enforcement officers may of course make reasonable inferences in the course of their investigative work, and reasonable suspicion is "not an onerous" burden.  *See Frazier*, 30 F.4th at 1174.   But "not every suspicion that is 'articulable' is reasonable," *United States v. Monsisvais*, 907 F.2d 987, 992 (10th Cir. 1990), and Trooper St. Onge's network of assumptions supplies "simply too slender a reed to support the seizure in this case," *Reid v. Georgia*, 448 U.S. 438, 441 (1980).  The Court respectfully concludes that Trooper St. Onge lacked reasonable suspicion to conduct a drug interdiction investigation at the *Rodriguez* moment based on the totality of the circumstances.

To hold otherwise, at least in this case, would tend to erode Fourth Amendment protections.   After all, "unparticularized hunches based on indicators so innocent or

susceptible to varying interpretations as to be innocuous cannot justify a prolonged traffic stop or vehicle search." *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) (quotation omitted).  Here, Trooper St. Onge and the Government have provided no additional facts that meaningfully contributed to Trooper St. Onge's suspicions at the *Rodriguez* moment or that could assign the indicia discussed above greater weight in a totality analysis—no criminal record, no evasive behavior, no items consistent with drug trafficking in plain view in the vehicle.  *See* [Hearing Tr. at 54:22–55:1 ("I simply asked him how his drive was going and he gave me unsolicited information about where he is going what he is going to do there, based on our database, based on all of that information, I established the reasonable suspicion.")]; *see also* [*id.* at 42:10–19] (Defendants "pulled over right away" and were "not trying to evade the stop").[13]  Having found that the *Rodriguez* moment occurred when Trooper St. Onge investigated Mr. Pita-Chavolla in the conflicts database, the Court does not have occasion to consider the Government's arguments, *see* [Doc. 47 at 9–10], about how Trooper St. Onge's suspicions may have been rendered reasonable by statements made by Defendants after Trooper St. Onge verified the VIN subsequent to the phone number search, *see Frazier*, 30 F.4th at 1179 ("Facts learned later in the investigation are irrelevant.").[14]

---

[13] Although Trooper St. Onge was ultimately correct to suspect drug trafficking in this case, that does not render his suspicions reasonable, and reasonableness remains the "ultimate touchstone" of the Fourth Amendment.  *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *see also United States v. Byron*, 817 F. App'x 753, 760 (11th Cir. 2020) (per curiam) ("The fact that [the officer's] hunch ultimately turned out to be correct is irrelevant for purposes of the Fourth Amendment." (quotation omitted)).

[14] The Court also does not consider at length those factors which Defendants anticipated might be part of the Government's attempt to meet its burden as to reasonable suspicion, *see, e.g.*, [Doc. 36 at 7–12], but which were not invoked in either the briefing or at oral argument.  For example, Mr. Pita-Chavolla told Trooper St. Onge that the pool business was slow at the time of the stop, [Ex. 1 at 08:26–08:36], and Trooper St. Onge indicated

The Court respectfully concludes that the Government has not met its burden to show that Trooper St. Onge had reasonable suspicion under the totality of the circumstances at the *Rodriguez* moment.[15]  *Cf. United States v. Byron*, 817 F. App'x 753, 760 (11th Cir. 2020) (per curiam) ("While reasonable suspicion is a less demanding standard than probable cause, an officer cannot engage in a fishing expedition based solely on a hunch that illegal activity may be afoot.").  Without reasonable suspicion to prolong the stop, Defendants' Fourth Amendment rights were violated, and the seizure of Defendants "remain[ed] illegal from that point forward."  *Frazier*, 30 F.4th at 1179.[16]  The Motion to Suppress [Doc. 36] and Motion to Suppress Unlawfully Obtained Evidence, and Request for an Evidentiary Hearing [Doc. 38] are **GRANTED**.

## II.    *Miranda* **Warnings**

Mr. Pita-Chavolla has separately moved to suppress the statements he made prior to his arrest based on *Miranda v. Arizona*.  He argues that he was subjected to custodial interrogation by Trooper St. Onge during the traffic stop without being advised of his rights pursuant to *Miranda*.[17]  *See generally* [Doc. 39].

---

in his report that this dynamic supplied "a motive for transporting contraband," [Ex. 4 at 8].  The Government did not rely upon this potential motive in its brief, *see* [Doc. 47 at 8–10], and Trooper St. Onge acknowledged at the hearing that this was "not criminal at all," [Hearing Tr. at 67:18–21].

[15] Having found a constitutional violation, the Court need not reach Mr. Pita-Chavolla's arguments, developed at length in the evidentiary hearing, with respect to whether Jax alerted to the presence of narcotics and was properly trained.  *See, e.g.*, [Doc. 38 at 13–14; Hearing Tr. at 200:18–206:08].

[16] The Government has not urged the application of any exception to the exclusionary rule.  *See generally* [Doc. 47; Doc. 48].

[17] Mr. Pita-Chavolla ultimately received *Miranda* warnings at some point after he was arrested and before he participated in an interview with Trooper St. Onge.  *See* [Hearing Tr. at 23:15–17].  His argument does not extend to those statements.  *See* [Doc. 39 at 1 ("[T]he defense notes that it is not contesting statements made immediately after Mr. Pita-

Under Tenth Circuit law, the issue is "whether a reasonable person in [Mr. Pita-Chavolla's] position would have understood [his] freedom of action to have been restricted to a degree consistent with formal arrest" during the traffic stop. *Revels*, 510 F.3d at 1275. Relevant factors include "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the defendant] aware that she was free to refrain from answering questions, or to otherwise end the interview." *Id.*

The Tenth Circuit has found that a traffic stop crosses the line into custody, implicating *Miranda*'s protections, where a detainee "was forced out of his car and onto the ground at gunpoint," was "questioned by two police officers while police helicopters hovered above," and remained "face down on the ground while the officers kept their guns drawn on him and his pregnant fiancee." *United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993). In the context of less coercive traffic stops, the court has rejected this line of argument. *See, e.g.*, *United States v. Benard*, 680 F.3d 1206, 1212 (10th Cir. 2012) (finding that a traffic stop did not implicate *Miranda* because a "trooper's orders for [d]efendant to show his hands and leave the car did not involve a level of force or command consistent with a formal arrest"); *United States v. Eckhart*, 569 F.3d 1263, 1276 (10th Cir. 2009) (noting that officers "did not take highly intrusive measures" where the defendant "was never handcuffed or placed in a police cruiser," "no weapons were

---

Chavolla was advised of his rights under *Miranda*.")]. At the evidentiary hearing, however, counsel for Mr. Pita-Chavolla suggested that "the Government failed to elicit what *Miranda* warnings Mr. Pita-Chavolla allegedly received." [Hearing Tr. at 206:17–207:3]. Not only has Mr. Pita-Chavolla acknowledged in his brief that he received *Miranda* warnings, [Doc. 39 at 1], but bodycam evidence shows Mr. Pita-Chavolla acknowledging that he received *Miranda* warnings, [Ex. 2 at 00:23–00:29].

drawn," and "the officers were polite in their demeanor and did not use or threaten the use of force at any time").

Here, Mr. Pita-Chavolla argues that, looking at the totality of the circumstances, "from the moment Mr. Pita-Chavolla was stopped, any reasonable person in his shoes would have understood his freedom of action to have been restricted to a degree consistent with formal arrest." [Doc. 39 at 4]. He suggests the traffic stop was a "police-dominated atmosphere" from the beginning, noting that "the trooper demanded his license [and] registration, and subjected him to a battery of questions." [*Id.*]. He also contends that Trooper St. Onge "showed his authority in a manner which restricted [Mr. Pita-Chavolla's] freedom" when Trooper St. Onge "ordered [Mr. Pita-Chavolla] out of his vehicle and had him wait and be questioned." [*Id.*]. Mr. Pita-Chavolla also notes that he was not informed that he could leave or refuse to answer questions. [*Id.* at 5]. In response, the Government argues that, on these facts, "it is clear that the defendant was not in custody." [Doc. 48 at 4].

Having reviewed the Parties' arguments, the testimony at the evidentiary hearing, and the bodycam footage, as well as the applicable law, the Court respectfully agrees with the Government that the circumstances of this traffic stop did not implicate "custody" for purposes of *Miranda*. The facts which Mr. Pita-Chavolla emphasizes do not meaningfully differentiate this case from routine, non-custodial traffic stops. *See, e.g.*, *Cortez*, 965 F.3d at 841 ("Nothing about the circumstances of the traffic stop suggest anything beyond an ordinary *Terry* stop occurred."). As the Government points out, only one officer was on the scene during the time in question, so the environment was no more police-dominated than any ordinary traffic stop. *See* [Doc. 48 at 4]. Additionally, Mr. Pita-

Chavolla stood, unrestrained, outside Trooper St. Onge's patrol vehicle window and occasionally stepped away to speak on the phone during their conversation.[18]   Trooper St. Onge's questions to Mr. Pita-Chavolla were neither coercive nor accusatory; they were largely friendly.   *See* [Ex. 1 at 04:20–18:55].   And Trooper St. Onge advised Mr. Pita-Chavolla that the interaction was being recorded.   [*Id.* at 04:33–04:36].

The cases cited by Mr. Pita-Chavolla are plainly distinguishable.   *United States v. Revels* involved seven officers entering a defendant's residence early in the morning, handcuffing her face down on the floor, and then bringing her into a closed room for questioning (no longer in handcuffs), where she was presented with contraband found in the home.   510 F.3d at 1275–77.   And in *United States v. Guillen*, the Tenth Circuit held that the defendant's in-home questioning became custodial when he was "pressed . . . despite his repeated denials of involvement" and confronted "with the mounting information and evidence collected during the search."   995 F.3d 1095, 1110 (10th Cir. 2021).   Here, in contrast, Mr. Pita-Chavolla consented to a quick body search and stood outside Trooper St. Onge's window discussing his travel plans, the weather, and trucks, among other topics.   Whatever the Fourth Amendment significance of that conversation, the Court finds no Fifth Amendment problems under *Miranda*.   No features of this traffic stop, either in isolation or combination, set it apart from the typical roadside encounter to which *Miranda* does not apply.   *Cf. Cortez*, 965 F.3d at 841 (noting that "polite questioning in the context of an ordinary traffic stop is a far cry from the intimidating, police-dominated

---

[18] The Court acknowledges that Trooper St. Onge testified that Defendants were not free to leave the scene during this portion of the stop.   *See, e.g.*, [Hearing Tr. at 45:16–24]. However, that is a feature of nearly every traffic stop, and it is insufficient to implicate *Miranda*.   *See Berkemer*, 468 U.S. at 436–37.

atmosphere present in *Revels* in which law enforcement relied on force and physical restraints").   The Court respectfully concludes that a reasonable person in Mr. Pita-Chavolla's position would not find that the fifteen minutes of police contact at issue prior to the *Rodriguez* violation bear the hallmarks of custodial arrest such that Trooper St. Onge was required to administer a *Miranda* warning to Mr. Pita-Chavolla.  The Motion to Suppress Statements of Ezequiel Pita-Chavolla, and Request for Evidentiary Hearing [Doc. 39] is respectfully **DENIED**.

## III.   Remaining Issues

The Court notes that its ruling with respect to the illegality of Defendants' seizure may have additional ramifications for other unresolved arguments.   For example, Mr. Pacheco has filed a pending Motion to Sever, [Doc. 37], which turns largely on the Sixth Amendment significance of introducing statements by Mr. Pita-Chavolla, which incriminate Mr. Pacheco, in their joint trial.  *See Bruton v. United States*, 391 U.S. 123 (1968).  However, it appears to the Court that some or all statements at issue in the Motion to Sever were made during a lengthy interview between Mr. Pita-Chavolla and Trooper St. Onge following the discovery of the contraband.  *Cf. Brown v. Illinois*, 422 U.S. 590, 602 (1975) ("If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.").   At least some of Mr. Pacheco's arguments in the Motion to Sever may thus no longer be before the Court.  The Court **ORDERS** the Parties to confer and file a Joint Notice with respect to what issues remain for decision, or whether this matter may proceed to trial.

**CONCLUSION**

For the foregoing reasons, it is **ORDERED** that:

(1)     The Motion to Suppress [Doc. 36] is **GRANTED**;

(2)     The Motion to Suppress Unlawfully Obtained Evidence, and Request for an Evidentiary Hearing [Doc. 38] is **GRANTED**;

(3)     The Motion to Suppress Statements of Ezequiel Pita-Chavolla, and Request for Evidentiary Hearing [Doc. 39] is **DENIED**; and

(4)     The Parties shall meet and confer and file a Joint Notice, on or before **February 28, 2024**, with respect to what aspects of the Motion to Sever [Doc. 37] remain for decision, or whether this case may proceed to trial.

DATED:  February 21, 2024                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge